UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE WYTHE BERRY FEE OWNER LLC

Case No. 1:25-cv-06305 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

This appeal from a decision of the United States Bankruptcy Court for the Southern District of New York concerns a mechanic's lien.  Wythe Berry Fee Owner LLC ("WBFO" or "Appellee"), was the owner in fee of certain commercial property in Brooklyn, New York (the "Property").  WBFO leased the Property to Wythe Berry LLC ("WB LLC"), and WB LLC subleased it to HealthQuarters, Inc. ("HQ").  HQ then hired Schimenti Construction Company LLC ("Schimenti" or "Appellant") to make improvements to the Property.  After HQ defaulted on its payments to Schimenti, Schimenti filed a mechanic's lien against the Property and, later, a claim in WBFO's bankruptcy proceedings for the same amount.  WBFO objected to that claim.

At bottom, the question on this appeal is straightforward: Did Schimenti receive consent from the owner of the Property to perform the work for which it later imposed its lien?  The Court finds that Schimenti did not receive that consent and, thus, AFFIRMS the bankruptcy court.

**BACKGROUND**

I. **Procedural History**

The bankruptcy court framed this dispute as presenting two "critical questions": "(1) who was the 'owner' of the Property (and what does 'owner' mean in the context of mechanic's liens asserted against a fee owner), and (2) did the 'owner' of the Property (or the owner's agent)

consent to the work performed by Schimenti *et al.*?" A.4 at A0073.[1] On April 23, 2025, following WBFO's and Schimenti's submission of prehearing briefs, the bankruptcy court held an evidentiary hearing on those questions. *See id.* at A0057-58. In a written decision on July 7, 2025, the bankruptcy court ruled that WBFO was the owner of the Property, and that neither WBFO nor any agent acting on its behalf had consented to Schimenti's work; the bankruptcy court therefore sustained WBFO's objection to, and expunged, Schimenti's claim. *See generally id.*

On July 31, 2025, Schimenti filed a notice of appeal of that decision in this Court. *See* Dkt. 1. On October 27, 2025, Schimenti filed its appellant brief, Dkt. 8 ("Br."), and its appellate appendix, Dkt. 9. WBFO filed an opposition, Dkt. 10 ("Opp."), and supplemental appendix, Dkt. 11, on November 26, 2025, and Schimenti filed a reply on December 10, 2025, Dkt. 12 ("Reply").

## II.    Ownership Structure

The parties do not dispute the ownership structure of the relevant entities in this matter as set forth by the bankruptcy court, and thus the Court incorporates them. WBFO is a single-member Delaware LLC; its single member is an entity called Wythe Berry Member LLC ("Member LLC"), which is also organized under Delaware law. A.4 at A0097. Member LLC, in turn, has two members, each owning 50% of the LLC: an individual named Zelig Weiss ("Weiss") is the non-managing member, and another entity, YG WV LLC ("YG WV") is the managing member. *Id.* at A0097-98. YG WV is also a single-member LLC; its sole member is

---

[1] Because the parties have included the bankruptcy court's opinion as part of the record on this appeal, the Court cites to that opinion at its location in the appendix. However, the opinion is also available at *In re Wythe Berry Fee Owner LLC*, No. 22-br-11340 (MG), 2025 WL 1870948 (Bankr. S.D.N.Y. July 7, 2025).

All Year Holdings Limited, a British Virgin Islands company that is, in turn, controlled by an individual named Yoel Goldman ("Goldman"). *Id.* at A0098.

WB LLC — the entity to which WBFO leased the Property — also has just two members, who own the LLC in equal share: Goldman and Weiss. *Id.* at A0100. Weiss has "sole control" over the management of WB LLC's business and affairs. *Id.*

## III.    The Lease Provisions

### A.    The Lease Between WBFO and WB LLC

WBFO leased the Property to WB LLC on February 28, 2017, and the lease agreement (the "Ground Lease") provided, among other terms, that WB LLC "shall not permit any liens, charges or encumbrances . . . upon the [Property]." A.59 at A1963, A1968. In the event that a lien was nevertheless placed on the Property, WB LLC was required to discharge it within 30 days; if WB LLC failed to do so, WBFO could discharge the lien and recover that cost from WB LLC in the form of additional rent. *Id.* at A1981. The Ground Lease further provided that it was not to be construed as WBFO's consent to any work that might give rise to a lien, or as permission for WB LLC to give such consent on WBFO's behalf:

> Nothing in this Lease shall be deemed in any way to: (a) constitute [WBFO]'s consent or request, express or implied, that any contractor, subcontractor, laborer or materialman provide any labor or materials for any alteration, addition, improvement or repair of the Leased Premises; or (b) evidence [WBFO]'s agreement to subject the Leased Premises to any such Lien.

> Nothing contained in this Lease shall be deemed or construed to mean that [WBFO] has granted [WB LLC] any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest, easement or Lien upon the estate of [WBFO] in the Leased Premises.

*Id.* Indeed, the only liens WB LLC could "create or permit to be created" under the Ground Lease were those against WB LLC's own "leasehold interest" in the Property. *Id.* at A1981-82.

The Ground Lease also provided that WBFO "shall have no obligations whatsoever to perform any work or make any repairs with respect to the Leased Premises, to furnish any services with respect to the Leased Premises, or to incur any expenses with respect to the Leased Premises," and that WB LLC "shall at all times . . . make such repairs, replacements and Alterations (as hereinafter defined) to the Leased Premises as are necessary to keep it in the condition required." *Id.* at A1970. Expenses for any repairs were to "be borne directly by" WB LLC. *Id.* WB LLC was permitted to make alterations to the Property in its discretion; for any material alteration, however — meaning any alteration that cost more than $500,000 and that materially affected the structure of the Property — WBFO's consent was required. *Id.* at A1971.

### B.    The Sublease Between WB LLC and HQ

WB LLC subleased the Property to HQ on March 21, 2022 (the "Sublease"). *See* A.34 at A1331. The Sublease imposed lien-related restrictions on HQ similar to those in the Ground Lease. Indeed, the Sublease required that HQ "shall not do or fail to do any act which shall or may render the Building of which the Demised Premises are a part, liable to any mechanic's lien or other lien"; nevertheless, in the event of a lien, the Sublease required that HQ, "at [its] own cost and expense, promptly remove" it within 30 days or else reimburse WB LLC for its own removal of the lien. A.34 at A1342-43.

The Sublease required that WB LLC and HQ each make improvements to the Property. *Id.* at A1340-45. However, the Sublease sought to ensure that those improvements did not result in a lien on the Property. Indeed, pursuant to the Sublease:

> [HQ] shall defend, indemnify and save harmless [WB LLC] against any and all mechanic's and other liens filed in connection with [HQ]'s Changes, including the liens of any security interest in, conditional sales of, or chattel mortgages upon, any materials, fixtures or articles so installed in and/or constituting part of the Demised Premises and against all costs, expense and liabilities incurred in connection with any such lien, security interest, conditional sale or chattel mortgage or any action or proceeding brought thereon.

4

*Id.* at A1352.  The Sublease even required that HQ submit an affidavit to WB LLC, upon completion of HQ's improvements, "that all bills have been paid and that there are no outstanding obligations owed with respect to any work performed." *Id.* at A1344.  Still, just as the Ground Lease permitted WB LLC to encumber its own leasehold interest with a lien, the Sublease permitted HQ "to have liens and security interests filed against [HQ's own] [p]roperty," *id.* at A1352, which the Sublease defined as, essentially, HQ's moveable personal property and medical equipment, *id.* at A1365.

### C.     The State Court Action and Bankruptcy Court Removal

On May 20, 2021, WBFO sent WB LLC a notice of cancellation and termination of the Ground Lease, alleging WB LLC had defaulted on its terms.  *See* A.42 at A1564.  The next month, WBFO filed an action in New York state court seeking, among other things, to eject WB LLC from the Property and preliminarily enjoin WB LLC from subleasing or altering the Property.  A.37 at A1489-90.  The state court denied WBFO's preliminary injunction request. *Id.* at A1502.  After WBFO went into bankruptcy proceedings, WB LLC removed the matter to the bankruptcy court.  A.52 at A1676-77.  In an October 5, 2023 opinion in that matter, the bankruptcy court determined, among other things, that WBFO had properly terminated the Ground Lease and that, as a result, the notice of cancellation and termination was effective as of May 20, 2021.  *Id.* at A1705.

**LEGAL STANDARD**

### I.     Standard of Review

This Court is "the first level appellate review for orders from a bankruptcy court."  *In re LightSquared, Inc.*, 534 B.R. 522, 525 (S.D.N.Y. 2015).  Sitting in that capacity, the Court "review[s] the bankruptcy court's findings of fact for clear error, its legal determinations de novo, and its discretionary rulings for abuse of discretion."  *In re Nordlicht*, 115 F.4th 90, 104

5

(2d Cir. 2024) (citation modified).  "A factual finding is not clearly erroneous unless 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *In re CBI Holding Co., Inc.*, 529 F.3d 432, 449 (2d Cir. 2008) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  The Court "may affirm on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below."  *Sec. Inv. Protection Corp. v. Bernard L. Madoff Sec. LLC*, 598 B.R. 102, 111 (S.D.N.Y. 2019) (quoting *Freeman v. J. Reg. Co.*, 452 B.R. 367, 369 (S.D.N.Y. 2010)).

## II.    Lien Law

In New York, a contractor "who performs labor or furnishes materials for the improvement of real property with the consent or at the request of [its] owner . . . or of his agent . . . shall have a lien for the principal and interest[] of the value, or the agreed price, of such labor . . . or materials."  N.Y. Lien Law § 3.  For purposes of this statute, an owner "includes the owner in fee of real property, or of a less estate therein, a lessee for a term of years, a vendee in possession under a contract for the purchase of such real property, and all persons having any right, title or interest in such real property."  *Id.* § 2(3).  The statute does not define "agent," but that term "has a definite and well-known meaning at common law," *People v. King*, 463 N.E.2d 601, 603 (N.Y. 1984); *see also In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 79 (2d Cir. 2019), which the Court will apply, *see White v. Pacifica Found.*, 973 F. Supp. 2d 363, 377 (S.D.N.Y. 2013) (applying New York common law where statute uses but does not define "agent").

Although the Lien Law does not require "explicit" consent of the owner or agent, "mere passive acquiescence is not consent . . . [and] there must be 'some affirmative act or course of conduct establishing confirmation.'"  *Sky Materials Corp. v Frog Hollow Indus., Inc.*, 4

6

N.Y.S.3d 91, 92 (N.Y. App. Div. 2015) (quoting *Zimmerman v. Carlson*, 741 N.Y.S.2d 118, 119 (N.Y. App. Div. 2002)).  An "'affirmative act' can include lease terms requiring specific improvements to the property," but "[w]hen a lease does not require improvements, the owner's overall course of conduct and the nature of the relationship between the owner and the lienor may demonstrate consent for purposes of Lien Law § 3."  *Ferrara v. Peaches Cafe LLC*, 115 N.E.3d 621, 626 (N.Y. 2018); *see also Joson Iron Works, Inc. v. Staten Island Majors Realty Corp.*, 164 F.3d 618, 618 (2d Cir. 1998) (unpublished table decision) ("[A] contractor cannot enforce a lien against the owner, as distinguished from the tenant, unless the owner has consented to the improvement.").

## DISCUSSION

Schimenti does not contest on appeal the bankruptcy court's determination of the first question presented to it, namely its finding that WBFO — and not Weiss — was the fee owner of the Property.  Instead, the appeal challenges the bankruptcy court's determination that WBFO did not consent to Schimenti's work, either in its own capacity or through an agent.  Schimenti argues that WBFO consented to its work in multiple ways.  First, Schimenti contends that Weiss or WB LLC had either actual, apparent, or implied authority as WBFO's agent and consented on WBFO's behalf.  Next, Schimenti argues that WBFO itself implicitly consented through certain lease terms and through its acceptance of the improvements Schimenti made on the Property.  Schimenti lastly argues, in connection with both contentions, that the doctrines of judicial estoppel and judicial admission bar WBFO from taking the position that it and WB LLC are distinct entities.  The Court will address these arguments in turn.

### I.    Agency

Schimenti argues that Weiss was an "owner" of the Property within the meaning of Lien Law §§ 2 and 3 because he was an agent of Member LLC and WBFO and acted with the actual

7

and apparent authority of those entities.  *See* Br. at 18-23.  The Court reviews *de novo* the

bankruptcy court's determination that no such agency relationship existed.  *ABM Indus. Grps.,*

*LLC v. Int'l Union of Operating Eng'rs, Local 30, 30A, 30B, AFL-CIO*, 968 F.3d 158, 161 (2d

Cir. 2020).

### A.    Actual Authority

Actual authority arises from "a principal's manifestation of intent to the agent that, as

reasonably understood by the agent, expresses the principal's assent that the agent take action on

the principal's behalf."  *In re Motors Liquidation Co.*, 777 F.3d 100, 105 (2d Cir. 2015) (quoting

Restatement (Third) of Agency § 3.01 (2006)).  "Such authority may be express or implied, but

in either case it exists only where the *agent* may reasonably infer from the *words* or *conduct* of

the *principal* that the principal has consented to the agent's performance of a particular act."

*Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Minskoff v. Am.*

*Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)).  "Express authority is

'authority distinctly, plainly expressed, orally or in writing,' while implied authority exists 'when

verbal or other acts by a principal reasonably give the appearance of authority to the agent.'"

*Hidden Brook Air v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 261 (S.D.N.Y. 2002)

(alteration adopted) (citation omitted) (first quoting *Nationwide Life Ins. Co. v. Hearst/ABC-*

*Viacom Ent. Servs.*, No. 93-cv-02680 (RPP), 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996);

and then quoting *99 Com. St., Inc. v. Goldberg*, 811 F. Supp. 900, 906 (S.D.N.Y. 1993)).

Schimenti's theory of actual authority is, ultimately, that WB LLC and Weiss were

"delegated the responsibility of the day-to-day control of the Property . . . through the various

operating agreements and the Ground Lease," and therefore had authority to consent to

Schimenti's work.  Br. at 19; *see* Reply at 2 ("[T]he Operating Agreements and Ground Lease

contain the very manifestation of intent to establish agency.").  Schimenti arrives at that theory

through several steps: (1) WBFO was "formed for the sole purpose of acquiring, owning, . . . leasing, [and] managing" the Property, Br. at 20-21 (quoting A.38 at A1505); (2) WBFO's operating agreement gave Member LLC "the sole power and authority" to act on the company's behalf, control the company's day-to-day operations, act as the company's agent, and delegate those rights to its own agent, *see id.* at 21 (quoting A.38 at 1505); (3) Member LLC "delegate[d] its responsibilities" over the Property "by agreeing to enter into a Ground Lease with WB [LLC]," *id.* at 20; (4) "[t]he Ground Lease, as a triple net lease, expressly provides that WB [LLC] would be in charge of managing the day-to-day business of the Property," *id.* at 19; and therefore (5) "Weiss, as a member of Member LLC, and managing member of WB [LLC]," received through these delegations "the responsibility for making all decisions required under the Ground Lease," *id.* at 20.  These steps, and the resulting theory, fail for multiple reasons.

First, Member LLC did not enter into the Ground Lease with WB LLC: WBFO did.  *See* A.59 at A1963 (stating that the Ground Lease is "by and between [WBFO] ('Lessor') and [WB LLC] ('Lessee')"); *see also id.* at A1990 (bearing the signatures of WBFO and WB LLC); A.39 at A1519 (Member LLC operating agreement describing WBFO as the "entity [that] will enter into, as landlord, that certain triple net lease of the Property to [WB] LLC").  Nor could Member LLC — a Delaware organization governed by Delaware law, *see* A.39 at A1517, A1526 — have entered into the Ground Lease with WB LLC.  In Delaware, members of a limited liability company have "no interest in the specific assets owned by the limited liability company." *Stone & Paper Investors, LLC v. Blanch*, No. 2018-0394-PAF, 2020 WL 3496694, at *10 n.40 (Del. Ch. June 29, 2020) (citing 6 Del. C. § 18-701); *accord United States v. Swartz Fam. Tr.*, 67 F.4th 505, 516 (2d Cir. 2023).  Member LLC cannot transfer a "greater right in the [P]roperty" than it holds. *Wilmington Hous. Auth. v. Nos. 500, 502, & 504 King St., & Nos. 503, 505 & 507 French St., Comm. Tr. Co.*, 273 A.2d 280, 281 (Del. Super. Ct. 1970).  Therefore, Member LLC did not

9

delegate (and could not have delegated) any authority over the Property to Weiss or WB LLC through the Ground Lease.

Second, if the Ground Lease (whether by delegation from Member LLC or from some other entity) created Weiss's actual authority, then the Ground Lease governed the scope of Weiss's actual authority.  *See N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013) ("When an agency relationship is purported to be established by contract, 'a court will look to the language of the agreement to ascertain the relationship created between the parties.'"  (quoting *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575 (2d Cir. 2010) (summary order)); *see also G.K. Alan Assoc., Inc. v. Lazzari*, 840 N.Y.S.2d 378, 384 (N.Y. App. Div. 2007) ("The duties of an agent are defined by the terms of the agreement that gave rise to the agency.").  And, fatally, the Ground Lease could not be clearer in restricting WB LLC (and, therefore, Weiss acting on behalf of WB LLC) from allowing the Property to be encumbered with a lien.  *See, e.g.*, A.59 at A01981 (withholding from WB LLC "any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest, easement or Lien upon the estate of [WBFO] in the [Property]").  The Ground Lease was additionally clear that it is not to "be deemed in any way to . . . evidence [WBFO]'s agreement to subject the [Property] to" a lien.  *Id.*  The fact that the Ground Lease permitted WB LLC to enter into subleases, *see, e.g.*, Reply at 6, 16, does not negate these express terms.

Those Ground Lease provisions would restrict any actual authority that might have been given to WB LLC or Weiss as WBFO's agent; they would also make it patently unreasonable for Weiss to infer that the Ground Lease manifested WBFO's consent to his arranging for

10

improvements to the Property that could result in a lien.[2]  *See Dinaco*, 346 F.3d at 68.  Even the

fact that the Ground Lease was a triple net lease, as Schimenti underscores, *see* Br. at 19,

demonstrates that WB LLC and Weiss were not permitted to allow the Property to be

encumbered, as that type of lease requires the lessee to "pay[] all the expenses, . . . leaving the

lessor with an amount *free of all claims*."  *Net-Net-Net Lease*, Black's Law Dictionary (12th ed.

2024) (emphasis added).  Schimenti's express and implied actual authority theories, *see* Br. at

28, both fail for these reasons.  *See Dinaco*, 346 F.3d at 68 (explaining that both express and

implied authority "exist[] only where the *agent* may reasonably infer from the *words* or *conduct*

of the *principal* that the principal has consented to the agent's performance of a particular act");

*accord Hidden Brook Air*, 241 F. Supp. 2d at 261.

Indeed, Schimenti repeatedly identifies the Ground Lease as either the source or the limit

of the actual authority that Weiss or WB LLC purportedly wielded.  *See, e.g.*, Br. at 21 ("Here,

the Ground Lease expressly delegates to WB [LLC] the right to enter into leases, operate,

manage the Property, and make or authorize improvements . . . [and WBFO] 'delegated' its

rights to operate, manage, lease, maintain and improve the Property under the Ground Lease[.]");

Br. at 19 ("The Ground Lease, as a triple net lease, expressly provides that WB [LLC] would be

in charge of managing the day-to-day business of the Property."); Reply at 3 (arguing that

Member LLC's operating agreement delegated "the responsibility to make all

decisions . . . required under the Ground Lease").  Yet Schimenti ignores the Ground Lease's

categorical non-consent to liens, even though that was a "critical[]" basis for the bankruptcy

---

[2] Weiss himself testified that he had "[n]ever had control over [WBFO] or authority to act on behalf of [WBFO]."  A.66 at A2773; *see also* A.26 at A0886, 119:4-6 (Weiss testimony that "it [is] [his] understanding that [he is] not an agent of [WBFO]").  Schimenti's contention that Weiss is "not . . . qualified to make the determination" of his own agency status, Reply at 7, misunderstands WBFO's argument, *see* Opp. at 20, and the law.

11

court's rejection of Schimenti's delegation arguments below, A.4 at A0081, and even though

WBFO points to the same provisions in opposition, Opp. at 23-24.[3]  The Court does not join

Schimenti in this selective reading of the Ground Lease.  *See Holick v. Cellular Sales of N.Y.,*

*LLC*, 802 F.3d 391, 395 n.9 (2d Cir. 2015) ("We interpret a contract 'to give full meaning and

effect to all of its provisions.'"  (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,

424 F.3d 195, 206 (2d Cir. 2005))); *accord Teliman Holding Corp. v. VCW Assocs.*, 180

N.Y.S.3d 109, 110 (N.Y. App. Div. 2022).

Schimenti muddies its agency arguments by later contending that the Ground Lease could

not have precluded its lien because the Ground Lease was, in fact, "terminated at the time the

[Sublease] was executed."  Br. at 32.  Recall the bankruptcy court's prior determination, in 2023,

that WBFO's Ground Lease termination in 2021 was proper and therefore effective as of that

date.  *See* A.4 at A0105.  Schimenti thus blames the bankruptcy court for "present[ing] an

inconsistency by simultaneously finding that the Ground Lease was terminated while applying

certain provisions to preclude the lien."  Br. at 34.  But if the Ground Lease was terminated at the

time of the Sublease, it cannot be the source of Weiss's or WB LLC's actual authority as

WBFO's agent.[4]  Perhaps realizing this problem, Schimenti presses the opposite argument on

---

[3] To be clear, this prohibition does not conflict with § 34 of the Lien Law.  *See* Br. at 33.  That
section of the law voids contracts that require the waiver of "the right to file or enforce any lien."
N.Y. Lien Law § 34.  But the Ground Lease does not require a waiver of those rights.  It
prohibits WB LLC from entering into agreements that could give rise to a lien, withholds
WBFO's own consent to any such lien, and establishes consequences for WB LLC in the event
that such a lien is nevertheless filed on the Property.

[4] If the Ground Lease was terminated at the time of the Sublease, then WB LLC also had no
leasehold rights in the Property *to* sublease, and the Sublease would be legally invalid.  *NPR
LLC I v. Elo Mgmt. LLC*, 59 N.Y.S.3d 244, 246 (N.Y. App. Div. 2017) ("A sublease is
dependent upon and limited by the terms and conditions of the paramount lease from which it is
carved[.]").  That would eradicate Schimenti's own argument, addressed later in this Opinion,
that the Sublease established WBFO's consent to its improvements.

reply: the Ground Lease was actually, it says now, "active at the time Schimenti performed its work" and indeed "continued in effect until October 5, 2023," thus "remain[ing] operative during the entirety of WB [LLC]'s use and occupancy." Reply at 9. The Court views the latter argument as an abandonment of the former. Ultimately, however, the Court need not resolve the parties' dispute on this point, *compare* Opp. at 23, *with* Reply at 9, because the Ground Lease cuts against Schimenti either way: either it was a nullity and therefore cannot have created an agency relationship, or it was in effect and its terms foreclosed Weiss and WB LLC from consenting to Schimenti's improvements on WBFO's behalf.

Schimenti additionally asserts that (1) WBFO "further expressly delegated" its day-to-day control over the Property to WB LLC and Weiss in its own operating agreement, Br. at 19, (2) YG WV, as WBFO's managing member, was given the same authority by WBFO's operating agreement and had the power to delegate it, *id.* at 20; Reply at 3, and (3) Member LLC first delegated its authority to WBFO, which then delegated it to WB LLC, Reply at 4. But Schimenti does not pursue these theories. It does not explain what part of WBFO's operating agreement effected an express delegation. It does not state that YG WV ever made a delegation of any authority; rather, Schimenti appears to contend that YG WV had authority and *Member LLC* delegated it. Br. at 20. And it provides no support for its assertion of a multi-step delegation from Member LLC to WBFO to WB LLC. To the contrary, Schimenti elsewhere claims that Member LLC's operating agreement "vested the Managing Member of Member LLC" (that is, YG WV) "[with] the responsibility to make all decisions affecting the business of the Company and all decisions required under the Ground Lease," Reply at 3, yet also contends that "Member LLC retained ultimate responsibility" for those same decisions, *id.* at 4. The Court will not "root through the record" to attempt to tie up the loose strands of these arguments. *E.W. v. N.Y.C. Dep't of Educ.*, No. 21-cv-11208 (VEC) (GWG), 2023 WL 4883324, at *2 n.5 (S.D.N.Y. July

31, 2023) (declining to search the record for evidence to support party's argument where party did not "direct the [c]ourt's attention to that evidence").

Therefore, the Court agrees with the bankruptcy court and finds that neither WB LLC nor Weiss had actual authority to consent to Schimenti's work on the Property or to bind WBFO to its lien.

### B.    Apparent Authority

Schimenti also argues that WB LLC and Weiss had apparent authority to consent to its work. *See* Br. at 26-27. The Court disagrees.

"Apparent authority arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him." *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 73 (2d Cir. 2012) (quoting *Dinaco*, 346 F.3d at 69). "To recover on this theory the third party must establish two facts: (1) the principal 'was responsible for the appearance of authority in the agent to conduct the transaction in question,' and (2) the third party reasonably relied on the representations of the agent." *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993-94 (2d Cir. 1991) (quoting *Ford v. Unity Hosp.*, 299 N.E.2d 659, 664 (N.Y. 1973)). Importantly, "[t]he apparent authority for which the principal may be held liable must be traceable to him; it cannot be established by the unauthorized acts, representations or conduct of the agent." *Ford*, 299 N.E.2d at 664 (citation omitted). "Thus, . . . apparent authority does not turn on the representations made by a principal to his agent, but rather on whether the representations made by the principal to a *third party* created the appearance of authority." *Hidden Brook Air*, 241 F. Supp. 2d at 261.

Schimenti fails to establish that WBFO (the principal) made any representations to Schimenti (the third party) to create apparent authority in Weiss or WB LLC (the alleged agents).

14

As Schimenti argues, some record evidence suggests that Weiss may have held himself out as the owner of the Property. *See* A.55 at A1726 (Weiss not objecting to or correcting HQ's identifying him as owner); A.57 at 1727-28 (Weiss identified as owner in list of documents on New York City Department of Buildings website); A.24 at A0761-62 (Schimenti VP of Construction testimony that Weiss signed "[b]uilding [p]ermits" and other documents "as the [o]wner" of the Property). But even if this evidence constitutes representations of authority by Weiss (a finding the Court does not reach), Weiss is the agent in this purported agency relationship — not the principal. Indeed, Weiss had no power to act on WBFO's behalf: that right was reserved to YG WV as the managing member of Member LLC, which in turn had "the sole power and authority to . . . transact any business in the name of [WBFO,] including . . . [WBFO]'s activity and lease" of the Property. A.38 at A1505. *See* A.39 at A1520-21 (appointing YG WV managing member of Member LLC and endowing it with power "to manage the business of [Member LLC] and . . . make all decisions affecting the business of [Member LLC]"). Any representations from Weiss as to ownership of the Property, therefore, are not WBFO's representations and do not create apparent authority in Weiss or WB LLC. *See Ford*, 299 N.E.2d at 664; *Hidden Brook Air*, 241 F. Supp. 2d at 261.

Schimenti's additional arguments — (1) that Weiss "play[ed] multiple roles" for the entities within the Property's "ownership structure" and never clarified what role he was speaking from when communicating with entities or individuals within that structure, and (2) that Schimenti's own policy is not to "start a job without the building owner's approval," Br. at 26 — are irrelevant for the same reason: they do not involve representations from WBFO.[5]

---

[5] Schimenti misreads WBFO's operating agreement by asserting that Weiss is "an undersigned part[y]" to it and, therefore, had authority to bind WBFO. *See* Reply at 7. WB LLC, not Weiss, is "the undersigned" party to WBFO's operating agreement. *See* A.38 at A1504 (operating agreement defining "the undersigned" as "the sole member of [WBFO]"); *id.* at A1512

Schimenti also argues that it "was reasonably led to believe" Weiss had apparent authority because WBFO delegated that authority to WB LLC and Weiss in the Ground Lease. Br. at 26. Of course, the Court has already held that no such delegation occurred. But that holding aside, the record evidence demonstrates that this delegation is Schimenti's theory now, not its understanding at the time it contracted with HQ. Indeed, Schimenti's CFO testified at the evidentiary hearing that he had "never reviewed the [Ground] [L]ease." A.26 at A0899, 132:15-24. Schimenti's VP of Construction likewise testified that he had only "recently reviewed" the Ground Lease, and that Schimenti "was not aware" even of WB LLC's existence "at the time it performed the work." A.24 at A0763, ¶ 30. Nor does Schimenti present any evidence suggesting that it ever tried to learn the identity of the Property's owner; the evidence demonstrates, rather, that Schimenti undertook no such diligence. *See, e.g.*, A.26 at A0901-02, 134:18-135:11 (CFO testifying that he did not "investigate the ownership of [WBFO]" or "the ownership of the [P]roperty" and "d[id] not know if anyone else [at Schimenti] did"). But as the bankruptcy court explained, "[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." A.4 at A0088 (quoting *Ford*, 299 N.E.2d at 664). Schimenti cannot release itself from that obligation now by complaining that the organizational structure behind the Property would have been too confusing for it to understand, had it tried. *See* Reply at 15.

Therefore, the Court agrees with the bankruptcy court and finds that Weiss and WB LLC did not have apparent authority to consent to Schimenti's work or bind WBFO to its lien.

---

(operating agreement further explaining that WBFO's sole member "shall be a corporation or limited liability company," not an individual); *id.* at A1515 (operating agreement signature page with WB LLC signing "in witness thereof" as "the undersigned, being the sole Member" (capitalization omitted)). Thus, WB LLC signed the agreement "by" Weiss as *WB LLC*'s "[m]ember" (and by YG WV as "its managing member," which in turn signed "by" Goldman as its "[a]uthorized [s]ignatory"). *Id.*

16

These rulings on agency also dispose of Schimenti's arguments that WBFO expressly consented to the Sublease, and thus Schimenti's work, through Weiss or WB LLC, Br. at 23-25, 31, and that the state court's denial of WBFO's request for a preliminary injunction "continued" Weiss and WB LLC's delegated authority, *id.* at 35-36, as both assume that Weiss or WB LLC had authority to act on WBFO's behalf as its agent.

## II.   Owner's Consent

Schimenti also argues that WBFO impliedly consented to its work "through lease terms that anticipate[d] improvements" to the Property, and because WBFO "accepted the benefits of the valuable improvements" Schimenti made.  Br. at 25.  Whether WBFO consented to Schimenti's work is a question of fact.  *See Nat'l Wall-Paper Co. v. Sire*, 57 N.E. 293, 294 (N.Y. 1900).  Therefore, the Court reviews the bankruptcy court's findings with respect to that question only for clear error.  *In re Nordlicht*, 115 F.4th at 104.

As a threshold legal matter, Schimenti charges the bankruptcy court with "rewriting" New York Lien Law § 3 by requiring "explicit owner consent" and ignoring the legal effectiveness of implied consent.  Br. at 16; *see id.* at 16-18.  But Schimenti does not point to, and the Court cannot find, any part of the bankruptcy court's opinion that construes § 3 in that way.  To the contrary, the bankruptcy court stated that the owner's "consent need not be explicit," A.4 at A0112 (quoting *Dewees Mellor, Inc. v. Weise*, No. 91-cv-02518 (ERK), 1993 WL 591608, at *2 (E.D.N.Y. Dec. 29, 1993)) and, instead, may be implied from, for example, the owner's "procuring [the] work, or . . . assent[ing] to the improvements in the expectation that he will reap their benefit," *id.* at A0113 (quoting *Eisenson Elec. Serv. Co. v. Wien*, 219 N.Y.S.2d 736, 739 (N.Y. Sup. Ct. 1961)).  In fact, Schimenti concedes that the bankruptcy court "cited caselaw that indicated implied consent can arise from a requirement that the work be performed" and "found that [WBFO] never required the work by Schimenti to be performed."

17

Br. at 18.  Contrary to Schimenti's assertion, then, the Court finds on *de novo* review that the bankruptcy court did not misconstrue the law.

Moving to the factual disputes, Schimenti next attempts to find WBFO's implied consent through "lease terms that anticipate improvements."  Br. at 25.  *See also* Br. at 24-25, 27-31; Reply at 16-17.  The trouble for Schimenti is that the improvement-requiring lease it refers to is the Sublease, not the Ground Lease.  *See* Reply at 17-18.  WBFO was not a party to the Sublease, *see* A.34 at A1331, and the Court has rejected Schimenti's theory that WBFO became a party through Weiss or WB LLC signing the Sublease as its agent, *see* Br. at 30.  *See supra*, Part I.  That distinguishes this case from those Schimenti cites, Br. at 24; Reply at 17, in which the leases calling for improvements were signed by the owners of the property and, thus, established the owners' consent.  *See McNulty Bros. v. Offerman*, 116 N.E. 775, 775-76 (N.Y. 1917) (Cardozo, J.) (explaining that the lease was between an individual and "the owners" of certain real property); *Nat'l Wall-Paper Co.*, 57 N.E. at 293-94 (explaining that "the defendant was the owner" of "the hotel premises" that he "demised" "by a written lease" to the plaintiff tenant); *M&B Plumbing & Heating Co. v. Cammarota*, 477 N.Y.S.2d 901, 902-03 (N.Y. App. Div. 1984) (explaining that a "land contract" between the owner and purchaser of property gave rise to a "landlord and tenant" relationship between the two parties, and that the purchaser hired a contractor to make improvements contemplated by the contract).

By contrast, the Ground Lease — the lease that *could* establish WBFO's consent — did not require improvements; it permitted them under certain conditions, including that WB LLC pay for them.  *See* A.59 at 1970-71.  That is not enough.  *See Ferrara*, 115 N.E.3d at 626 ("The consent required by Lien Law § 3 is not a mere acquiescence by the owner to improvements by a lessee in possession at the lessee's own expense.") (alterations adopted) (quoting *P. Delaney & Co. v. Duvoli*, 16 N.E.2d 354, 355 (N.Y. 1938)).  And the bankruptcy court found that Schimenti

had failed to "point to a provision in the [Ground] Lease which would suffice to operate as [WBFO]'s blanket *ex ante* consent to [Schimenti]'s work on the Property — and, indeed, there is ample evidence that the [Ground] Lease in fact *did not* constitute [WBFO]'s consent."  A.4 at A0090.  This finding comports with the Court's review of the terms of the Ground Lease.

What's more, the record evidence supports the bankruptcy court's determination that WBFO had no knowledge of the Sublease or its terms, or of Schimenti's "presence and work on the [P]roperty," A.4 at A0084, which further undermines Schimenti's contention that WBFO consented to Schimenti's work through the Sublease.  Indeed, as Schimenti itself underscores, *see* Reply at 5, Weiss testified that WB LLC did not "consult[] or inform[]" WBFO regarding the Sublease, and that he "did not ever communicate . . . with any representative or attorney for [WBFO], Member LLC, YG WV, or All Year Holdings" about the Sublease.  A.66 at 2773-74. Schimenti highlights that it and HQ "worked directly with Weiss" to obtain building permits for its improvements to the Property, Br. at 29, but Weiss is neither WBFO nor WBFO's agent, and so his dealings with Schimenti and HQ do not bind WBFO.

Nor did WBFO impliedly consent to Schimenti's work by merely receiving its benefits. *See* Br. at 25, 29.  The requirement for consent is not just that the improvements could conceivably raise a property's value, *see id.* at 29, but rather that the owner assent to the improvements *expecting* such a benefit.  *See Ferrara*, 115 N.E.3d at 624 ("[T]o fall within [Lien Law § 3,] the owner must either be an affirmative factor in procuring the improvement to be made, or[,] having possession and control of the premises[,] assent to the improvement in the expectation that he will reap the benefit of it."  (quoting *Rice v. Culver*, 64 N.E. 761, 762-63 (N.Y. 1902))).  The bankruptcy court did not err in finding that Schimenti failed to present evidence of that assent from WBFO, *see* A.4 at A0126 ("All Schimenti can plausibly allege is

19

'mere acquiescence' to work and 'benefit' from it, which, New York caselaw makes clear, is not sufficient[.]"), and indeed Schimenti presents no such evidence here.

For the same reason, Schimenti does not succeed in arguing that WBFO had constructive knowledge of its work on the Property, and that WBFO's failure to object to that work is "an important fact" showing its consent. *See* Br. at 23 (quoting *Nat'l Wall-Paper Co.*, 57 N.E. at 296). Failure to object is not an affirmative demonstration of consent. *See Sky Materials Corp.*, 4 N.Y.S.3d at 92. And in *National Wall-Paper Co.*, cited by Schimenti, the owner did far more than not object. He "was in attendance constantly, examining the work as it progressed and . . . was familiar with every detail of the work in every room and part of the building"; "he repeatedly expressed himself as pleased with what was being done for the improvement of his property," including by "frequently" commenting "in admiration of the beauty and good taste of the decorations and other changes made"; and he had previously not objected when the tenant had "procured the [same contractor] to decorate one or two rooms in order to furnish a specimen of the work, and then called the attention of the [owner] to the work . . ., and informed [the owner] that" he planned to have the contractor "decorat[e] the whole house in that style" for "a lot of money." *Nat'l Wall-Paper Co.*, 57 N.E. at 295. Schimenti has furnished no evidence of WBFO's involvement on that level, or at all, in its improvements, and the bankruptcy court did not err in holding against Schimenti on that point.[6]

---

[6] These rulings obviate discussion of Schimenti's additional argument that, because WB LLC was not paying for its improvements, those improvements were not "material alterations" within the meaning of the Ground Lease and therefore did not require WBFO's consent. Reply at 12-14. Briefly, however, the Court notes that the Ground Lease's definition of "material alterations" does not exclude improvements paid for by an entity other than WB LLC. *See* A.59 at A1971.

### III.    Judicial Estoppel and Judicial Admission

Finally, Schimenti contends that WBFO "purposefully conflat[ed]" itself and WB LLC as the same entity in state court proceedings.  Br. at 37; *see also id.* at 36-39.  Thus, it says, the bankruptcy court erred in not finding that judicial estoppel and the concept of judicial admissions preclude WBFO from now denying such an identity.  *Id.*  The Court reviews this determination for abuse of discretion, *see Clark v. All Acquisition, LLC*, 886 F.3d 261, 265 (2d Cir. 2018); *see also In re Motors Liquidation Co.*, 590 B.R. 39, 56 (S.D.N.Y. 2018) ("A lower court's determination that a statement is a judicial admission is reviewed on appeal for abuse of discretion."), *aff'd*, 957 F.3d 357 (2d Cir. 2020) (per curiam), but would reach the same conclusion even under *de novo* review.

Both judicial estoppel and judicial admissions bind a party to a factual position it has previously taken.  *See Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (estoppel); *In re Motors Liquidation Co.*, 957 F.3d at 360 (admission).  For that reason, neither doctrine applies here.  Indeed, the "purposeful[] conflati[on]" Schimenti alleges is that WBFO and WB LLC, in the state court action, jointly submitted an amended answer in which they referred to themselves, "together, [as] 'Wythe Berry' or 'Answering Defendants'" for purposes of that filing.  A.54 at A1716; *see* Br. at 37 (citing A.54).  That WBFO and WB LLC answered together suggests they deemed their interests aligned with respect to that filing; that they referred to themselves collectively using a defined term is a routine aspect of legal drafting, as WBFO's restructuring officer testified at the hearing.  *See* A.26 at A0815, 48:19-49:7 ("Q.  So they are saying that [WB] LLC is the owner of the property.  A.  No.  They are saying that the Defendant, [WBFO], and [WB LLC] together will be called Wythe Berry for this case. . . .  I believe this is being done for convenience for writing legal documents.").

21

Schimenti says the state court adopted this purportedly factual position by later staying that case as to both WBFO and WB LLC upon WBFO's declaring bankruptcy, and Schimenti contends that this further supports a finding of judicial estoppel. *See* Br. at 37; *see also Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006) (party invoking judicial estoppel must show that the court "adopted . . . in some matter" the position its opponent took "in a prior proceeding"). But only Schimenti's conjecture supports its conclusion that this was the state court's basis for extending the stay to WB LLC. The Court is not persuaded by that unsupported surmise. Therefore, the bankruptcy court did not abuse its discretion or otherwise err in rejecting Schimenti's arguments as to judicial estoppel and judicial admissions.

## CONCLUSION

For all the reasons explained above, the Court AFFIRMS the bankruptcy court's decision in full.

Dated: January 21, 2026
    New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge

22